# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN

ANTHONY DAUNT,

        *Plaintiff*,

v.

JOCELYN BENSON, in her official capacity as Michigan Secretary of State; and JONATHAN BRATER, in his official capacity as Director of the Michigan Bureau of Elections,

        *Defendants*.

**COMPLAINT**

Case No. 1:20-cv-522

Plaintiff, Anthony ("Tony") Daunt, brings this action under the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §20507, against Defendants for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. Section 8 of the NVRA requires States to maintain clean and accurate voter registration records.

2. Michigan has failed to live up to this requirement.

3. Michigan's list-maintenance failures were put on full display in the August 2020 primary. After the State relied on the existing voter rolls to mail absentee-ballot applications to all registered voters, roughly 500,000 applications were returned—i.e., roughly half a million voters are still on the rolls even though they likely moved or died. And an additional 300,000 applications, according to Michigan's former Secretary of

State, were likely sent to voters who had moved or died but were never returned to the State.

4. None of this is surprising. At least 16 counties in Michigan have registration rates that far eclipse the national and statewide voter registration rate in recent elections. Leelanau County has more active registered voters than it has adult citizens who are over the age of 18. That number of voters on the rolls is impossibly high. An additional 15 counties—Antrim, Benzie, Charlevoix, Cheboygan, Emmet, Grand Traverse, Iosco, Kalkaska, Keweenaw, Livingston, Mackinac, Oakland, Otsego, Roscommon, and Washtenaw—have active voter registration rates that exceed 90 percent of adult citizens over the age of 18.

5. Based on this and other evidence, Defendants are failing to make a reasonable effort to conduct appropriate list maintenance as required by the NVRA.

## JURISDICTION AND VENUE

6. The Court has subject-matter jurisdiction because this case alleges violations of the NVRA. 28 U.S.C. §1331.

7. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Defendants "reside" here. 28 U.S.C. §1391.

## PARTIES

8. Plaintiff, Tony Daunt, is a duly registered Michigan voter. Daunt regularly votes in Michigan's primary and general elections. He plans to vote in Michigan's

upcoming elections, including for U.S. President, U.S. Senate, and other local and statewide offices and ballot measures.

9.  Because Defendants do not maintain accurate voter rolls, ineligible voters can and do vote in Michigan elections. Those votes dilute Daunt's legitimate vote. And Michigan's inaccurate rolls undermine Daunt's confidence in the integrity of Michigan elections, which also burdens his right to vote. Daunt's vote is diluted, and his confidence undermined, no matter which political party or candidate the ineligible individuals vote for.

10. Daunt has long been an active member of the Republican Party. He works in Michigan to advance conservative policies and to help elect Republican candidates. Daunt has served, among other roles, as a field director for the College Republican National Committee and a logistics manager and director for the Michigan Republican Party. He is currently an officer and member of the governing body of the Clinton County Republican Party, a member of the governing body of the Michigan Republican Party Committee, and the executive director of the Michigan Freedom Fund.

11. Because Defendants do not maintain accurate voter rolls, Daunt must spend more of his time and resources monitoring Michigan elections for fraud and abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance. Daunt also must spend more of his time and resources on get-out-the-vote efforts for like-minded individuals—eligible voters who, because Defendants do not maintain accurate voter

rolls, lack confidence in the accuracy and integrity of Michigan elections. The time and resources that Daunt diverts to these activities would otherwise be spent on other projects and activities that would advance his goals.

12. Defendant Jocelyn Benson is Michigan's Secretary of State. She is the State's chief election officer, Mich. Comp. Laws §168.21, and is responsible for coordinating the statewide list maintenance required by the NVRA, 52 U.S.C. §20509. Secretary Benson is sued in her official capacity.

13. Defendant Jonathan Brater is Michigan's Director of Elections. He is responsible for "perform[ing] the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws." Mich. Comp. Laws §168.32. Director Brater is sued in his official capacity.

## BACKGROUND

### I. Statutory Background

14. Congress enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. §20501(b)(3). Specifically, section 8 was enacted "to ensure that accurate and current voter registration rolls are maintained." §20501(b)(4).

15. Retaining voter rolls bloated with ineligible voters harms the electoral process, heightens the risk of electoral fraud, and undermines public confidence in elections. "Confidence in the integrity of our electoral processes is," in turn, "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

16. Section 8 obligates States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" due to death or change of residence. 52 U.S.C. §20507(a)(4). "[F]ederal law makes this removal mandatory." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018).

17. Each State's program for maintaining voter-registration lists must be "uniform, non-discriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. §20507(b)(1).

18. Specifically, section 8 requires States to "remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant; or (B) a change in the residence of the registrant" to outside her current voting jurisdiction. 52 U.S.C. §20507(4)(A)-(B).

19. The Help America Vote Act (HAVA) also mandates that states adopt computerized statewide voter registration lists and maintain them "on a regular basis" in accordance with the NVRA. 52 U.S.C. §21083(a)(2)(A).

20. States must "ensure that voter registration records in the State are accurate and are updated regularly," an obligation that includes a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. §21083(a)(4).

21. HAVA's list-maintenance requirements include coordination with "State agency records on death" and "State agency records on felony status" to facilitate the

removal of individuals who are deceased or rendered ineligible under state law due to a felony conviction. 52 U.S.C. §21083(a)(2)(A)(ii)(I)-(II).

22.     According to the bipartisan Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections." Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters" invite "fraud." "While election fraud is difficult to measure" (because many cases go undetected, uninvestigated, or unprosecuted), "it occurs." "In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference." And "the perception of possible fraud contributes to low confidence in the system." The Supreme Court agrees. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) (op. of Stevens, J.).

23.     Other courts and experts have likewise recognized that voter fraud is both real and notoriously "difficult to detect and prosecute." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020). According to Justice Stevens, "the risk of voter fraud"—particularly with "absentee ballots"—is "real." *Crawford*, 553 U.S. at 195-96; *accord Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections … and it is facilitated by absentee voting."); *Veasey v. Perry*, 71 F. Supp. 3d 627, 641 (S.D. Tex. 2014) (finding broad "agreement that voter fraud actually takes place in abundance in connection with absentee balloting"); *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring) ("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud."). As Professor Michael Morley

puts it, "election officials can neither exercise control over absentee ballots once they are mailed out to voters, nor ensure that they have been received and cast by the voters entitled to do so." Stated differently, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin*, 385 F.3d at 1131.

24. Michigan, too, has experienced known cases of voter fraud.

25. But the known cases are a small percentage of the overall cases because Michigan is not well equipped to detect fraud. Michigan has no system in place to detect when people vote in multiple States, for example. While the Electronic Registration Information Center can reveal whether voters have moved out of state, 40% of States do not participate in that voluntary program.

26. Recently, moreover, Secretary Benson created an online absentee ballot application that does not require individuals to verify their identity with a signature. Applicants can instead click a box that automatically transfers a signature already on file to the application. According to experienced clerks, this system eliminates "a very important step to confirm the ballot being sent is actually to the voter who requested it."

27. Recognizing these concerns, the NVRA includes a private right of action. It empowers any "person who is aggrieved by a violation" to "provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. §20510(b)(1). "If the violation is not corrected within 90 days after receipt of a notice,

… the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief." §20510(b)(2).

## II. Defendants' Obligations

28. Federal law makes Michigan's Secretary of State primarily responsible for list maintenance.

29. The NVRA requires each State to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under" the law. 52 U.S.C. §20509.

30. Michigan law designates the Secretary of State as the State's chief election officer. Mich. Comp. Laws §168.21. It further instructs the Director of Elections to "perform the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws." §168.32.

31. Ultimate responsibility for coordinating and overseeing all list-maintenance activities rests with the Secretary. A chief election official "may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

32. Indeed, "the NVRA's centralization of responsibility counsels against ... buck passing." *Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014). Courts have rejected the view that, "once the state designates" a local entity to assist with complying with federal law, "her responsibility ends." *Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir.

2008). "[I]f every state passed legislation delegating" their responsibilities "to local authorities, the fifty states would be completely insulated from any enforcement burdens." *Id.*

### III. Defendants' Failure to Meet Their List-Maintenance Obligations

33. An estimated "24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate." *Husted*, 138 S. Ct. at 1838. Michigan is no exception. It is failing to meet its list-maintenance obligations.

34. Based on data gathered from the U.S. Census Bureau's 2014-18 American Community Survey and a July 2019 count of active registered voters from the Secretary of State's office, one Michigan county has more active registered voters than voting-eligible citizens, and 15 others have suspiciously high rates of active voter registration.

35. Comparing the active registered voter count as of July 2019 to the 2014-18 American Community Survey reveals that Leelanau County has an active registration rate of 102%. In other words, there are more registered voters than eligible voters.

36. Additionally, 15 other counties across the State purport to have more than 90% (in some cases, approaching 100%) of their citizen voting-age populations registered and active: Antrim (97.5%), Benzie (97.2%), Charlevoix (94.4%), Cheboygan (90.2%), Emmet (97.2%), Grand Traverse (95.3%), Iosco (90.4%), Kalkaska (93.5%), Keweenaw (92.1%), Livingston (93.5%), Mackinac (92.3%), Oakland (92.7%), Otsego (93.6%), Roscommon (91.2%), and Washtenaw (91.1%).

37. These voter registration rates are abnormally—or in the case of Leelanau, impossibly—high.

38. According to the U.S. Census Bureau, 66.9% of the citizen voting-age population was registered nationwide in the November 2018 election.

39. Similarly, 70.3% of the citizen voting-age population was registered in the November 2016 election.

40. The U.S. Census Bureau further reports Michigan's statewide voter registration rates for the 2018 and 2016 elections as 73.4% and 74.1% of the citizen voting-age population, respectively.

41. Thus, these 16 counties are significant outliers, touting voter registration rates 20 to 30 percentage points higher than the national figures from 2018 and 2016, and 15 to 25 percentage points higher than the state figures for the same period.

42. The number of active registered voters in each of these counties has only increased since July 2019, according to the Secretary's July 2020 data.

43. There is no evidence that these counties experienced above-average voter participation compared to the rest of the country or State. The only explanation for these discrepancies is substandard list maintenance.

44. According to a separate analysis of the State's Qualified Voter File conducted by Bridge, the number of registered voters in Michigan exceeds the State's entire voting-age population by more than 225,000. No other State in the Great Lakes

region has more registered voters than eligible voters. Bridge also found 16,000 voters who were born before 1920 but nevertheless remained registered.

45. "[S]ignificantly high registration rates," like these, are a telltale sign that clerks are "not properly implementing a program to maintain an accurate and current voter registration roll, in violation of the NVRA." *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 791 (W.D. Tex. 2015).

46. For example, the United States sued Indiana for violating the NVRA in 2006, noting in its complaint that "25 counties had registration totals of 90-95%" of their voting-age population. Indiana quickly confessed to violating the NVRA in a consent decree.

47. Judicial Watch and True the Vote sued Indiana in 2012, explaining in their complaint that "26 counties … have voter registration rolls that contain between 90% and 100% of TVAP." Indiana agreed to conduct a significant, statewide process to clean up its voter rolls.

48. Also in 2012, Judicial Watch and True the Vote sued Ohio under the NVRA, alleging that "thirty-one counties … have voter registration rolls that contain between 90% and 100% of total voting age population." Ohio agreed to implement heightened review of the accuracy of its voter rolls.

49. In December 2019, the Public Interest Legal Foundation sued Detroit under the NVRA, alleging that "Detroit has more registered voters than adult citizens

of voting age (106%)." The suit was dismissed on June 29, 2020, because Detroit removed substantial numbers of invalid registrations.

50. Michigan itself has identified problems with list maintenance in the State.

51. Michigan's former Secretary of State, Ruth Johnson, recently stated that Michigan's voter rolls are "very flawed" and that "[w]e know it's a flawed list."

52. According to the State's latest report to the federal Election Assistance Commission, Michigan's Qualified Voter File (created to maintain the accuracy of Michigan's voter rolls) "does not track automatically" critical information including many "[d]uplicate registrations," "[i]nvalid or rejected applications," "[c]onfirmation cards returned," or "[r]esult[s] of returned confirmation card." While this information can be entered manually, an internal "review" revealed that "information isn't always being entered into QVF properly."

53. Michigan also does not require clerks, when conducting list maintenance, to use information from the U.S. Postal Service's National Change of Address system. *See* Mich. Comp. Laws §168.509aa(a).

54. This past summer, Michigan's voter rolls underwent a largescale test of their accuracy—and failed badly.

55. From May to August 2020, the State mailed absentee-ballot applications to every registered voter, using the information on the current voter rolls.

56. Approximately 500,000 applications were returned to the State because, for example, the individuals had died or moved.

57. An estimated 300,000 additional ballots were sent to people who had died or moved but were not returned to the State.

58. Individuals reported thousands of applications that were sent to people who had died, had moved out of state, or are not U.S. citizens.

59. Despite the massive number of inaccuracies that this mailing revealed, Secretary Benson did not use this information to clean up the voter rolls—even though much of the information was available more than 90 days before the November election. The applications she sent out did not even ask individuals to return them if they were sent to someone who no longer resides at that mailing address.

60. Defendants' failure to maintain accurate voter rolls violates federal law and jeopardizes the integrity of the State's upcoming elections.

### IV. Plaintiff's Statutory Notice

61. Under the NVRA, "Plaintiffs have [statutory] standing assuming they provided proper notice within the meaning of 52 U.S.C. §20510(b)(1)." *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1362 (S.D. Fla. 2016).

62. On February 26, 2020, Daunt mailed a statutory notice letter to Secretary Benson and Director Brater, notifying Defendants that at least 19 Michigan counties were in violation of section 8 and formally requesting that Defendants correct these violations within the 90-day timeframe specified in federal law. *See* Exh. A.

63. Daunt has since received updated comparisons based on recently available data, revealing that 16 Michigan counties are in violation of section 8. Those numbers are reflected above.

64. The notice letter stated that Daunt "hope[d] to avoid litigation and would welcome immediate efforts by [Defendants] to bring Michigan into compliance with Section 8."

65. Daunt asked the Secretary and Director to establish "a comprehensive and nondiscriminatory list maintenance program in compliance with federal law" and to "identify and remove [several] categories of individuals from the official lists of eligible voters."

66. Daunt asked that the Secretary and Director "respond in writing within 45 days of the date of this letter," "fully describ[ing] the efforts, policies, and programs [Defendants] are taking, or plan to undertake prior to the 2020 general election to bring Michigan into compliance with Section 8" and "not[ing] when [they] plan to begin and complete each specified measure and the results of any programs or activities you have already undertaken."

67. Additionally, Daunt requested that the Secretary and Director advise him "what policies are presently in place, or will be put in place, to ensure effective and routine coordination of list maintenance activities with the federal, state, and local entities" and to provide him with "a description of the specific steps [they] intend to

take to ensure routine and effective list maintenance on a continuing basis beyond the 2020 election."

68. Daunt also requested that all Defendants take steps to preserve documents as required by section 8(i) of the NVRA, 52 U.S.C. §20507(i)(1)-(2), and other federal law. *See, e.g.*, *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 963 (S.D. Tex. 2010) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").

69. Finally, the notice letter stated that Daunt would file a lawsuit under 52 U.S.C. §20510(b)(2) if the identified violations were not corrected within 90 days of receipt of his letter.

70. Defendants failed to respond to the notice letter.

## COUNT
## Violation of the NVRA

71. Plaintiff repeats and realleges each of his prior allegations.

72. Defendants have failed to make reasonable efforts to conduct voter list-maintenance as required by §20507(a)(4) of the NVRA.

73. Plaintiff has suffered irreparable injuries as a direct result of Defendants' violation of section 8 of the NVRA.

74. Plaintiff will continue to be injured by Defendants' violations of section 8 of the NVRA until Defendants are enjoined from violating the law.

75. Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A. A declaratory judgment that Defendants are in violation of section 8 of the NVRA;

B. An injunction requiring Defendants to fully comply with any existing procedures that Michigan has in place to ensure ineligible voters are identified and removed from the rolls;

C. An injunction requiring Defendants to develop and implement additional reasonable and effective registration list-maintenance programs to cure their failure to comply with section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls;

D. Plaintiff's reasonable costs and expenses of this action, including attorneys' fees; and

E. All other further relief that Plaintiff may be entitled to.

                                                    Respectfully submitted,

Dated: June 9, 2020                 */s/ Cameron T. Norris*
                                                William S. Consovoy
                                                Cameron T. Norris
                                                Tiffany H. Bates
                                                CONSOVOY MCCARTHY PLLC
                                                1600 Wilson Blvd., Ste. 700
                                                Arlington, VA 22209
                                                will@consovoymccarthy.com
                                                cam@consovoymccarthy.com
                                                tiffany@consovoymccarthy.com

                                                Jason Torchinsky
                                                HOLTZMAN VOGEL
                                                   JOSEFIAK TORCHINSKY PLLC
                                                45 North Hill Drive, Ste. 100
                                                Warrenton, VA 20186
                                                (540) 341-8800
                                                JTorchinsky@hvjt.law

                                                *Counsel for Plaintiff*