UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY DAUNT,

     Plaintiff,

v                                 No. 1:20-cv-00522

JOCELYN BENSON, in her official capacity as     HON. ROBERT J. JONKER
Michigan Secretary of State, JONATHAN
BRATER, in his official capacity as Director of
the Michigan Bureau of Elections,

     Defendants,                    **BRIEF IN SUPPORT OF**

A. PHILIP RANDOLPH INSTITUTE –         **DEFENDANTS SECRETARY OF**
DETROIT/DOWNRIVER; RISE, INC.,       **STATE JOCELYN BENSON AND**
                                  **DIRECTOR OF ELECTIONS**

     Intervenor-Defendants,       **JONATHAN BRATER'S MOTION**
                                  **TO DISMISS PLAINTIFF'S**

LEAGUE OF WOMEN VOTERS OF          **AMENDED COMPLAINT (DOC.**
MICHIGAN; LEAGUE OF WOMEN VOTERS       **31)**
OF GRAND TRAVERSE AREA; LEAGUE OF
WOMEN VOTERS OF ANN ARBOR AREA;
LEAGUE OF WOMEN VOTERS OF
LEELANAU COUNTY; LEAGUE OF WOMEN
VOTERS OF COPPER COUNTY and
LEAGUE OF WOMEN VOTERS OF
OAKLAND AREA,

     Intervenor-Defendants.

_____

| | |
|---|---|
| William S. Consovoy | Elizabeth Husa Briggs (P73907) |
| Cameron T. Norris | Heather S. Meingast (P55439) |
| Tiffany H. Bates | Erik A. Grill (P64713) |
| Attorneys for Plaintiff | Attorneys for Defendants Benson & |
| 1600 Wilson Blvd, Suite 700 | Brater |
| Arlington, VA 22209 | PO Box 30736 |
| | Lansing, Michigan 48909 |
| Jason Torchinsky | 517.335.7659 |
| Attorney for Plaintiff | |
| 45 North Hill Drive, Ste 100 | |
| Warrenton, VA  20186 | |
| 540.341.8800 | |

_____/

**BRIEF IN SUPPORT OF DEFENDANTS SECRETARY OF STATE JOCELYN BENSON
AND DIRECTOR OF ELECTIONS JONATHAN BRATER'S MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT (DOC. 31)**

DANA NESSEL
Attorney General

Elizabeth R. Husa Briggs (P73907)
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants Secretary of State
Benson and Director of Elections Brater
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  briggse1@michigan.gov
P73907

Dated: October 14, 2020

# TABLE OF CONTENTS

Page

Concise Statement of Issues Presented ................................................................. ii

Controlling or Most Appropriate Authority ........................................................... iii

Introduction ............................................................................................................ 1

Statement of Facts ................................................................................................. 2

    A.    Overview of NVRA's list maintenance requirements. ..................................... 2

    B.    Michigan's general list maintenance practices. ............................................. 6

        1.    Deceased voters ..................................................................................... 6

        2.    Address changes .................................................................................... 7

Standard of Review ................................................................................................ 9

Argument ............................................................................................................... 10

I.    This Court lacks jurisdiction over claims brought by a Plaintiff who lacks standing. ........................................................................................................ 11

    A.    The February 26, 2020 letter did not satisfy the necessary pre-requisite for asserting a private cause of action under the NVRA. ..................................... 12

    B.    Plaintiff's allegations fail on their face to allege Article III standing. .............. 14

        1.    Daunt has not alleged a concrete injury, personal to him. .................... 14

        2.    Even the alleged, personal "fear" is not a cognizable injury-in-fact. ...... 18

        3.    Any concrete injury that may be alleged lacks sufficient imminency or a fair traceability to a Defendant's conduct. .................. 19

        4.    A favorable ruling would not redress any alleged injury ...................... 21

II.    Plaintiff's claim of vote dilution fails as a matter of law. ........................... 24

Conclusion and Relief Requested ......................................................................... 24

Certificate of Service ............................................................................................. 25

i

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      Plaintiff's amended complaint should be dismissed for lack of standing because
Plaintiff has not alleged a cognizable injury-in-fact, particular to him, which is
fairly traceable to any Defendant's conduct and which would be redressable by a
favorable judicial decision.

2.      To the extent Plaintiff's claims rest on a theory of vote dilution, such claims fail
as a matter of law because Plaintiff has not identified that Plaintiff is a member of
a sub-group of the population, whose vote will be diluted by voting of the
majority.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Federal Statutes**

52 U.S.C. § 20501(b)

52 U.S.C. § 20507

**US Supreme Court authority**

*Husted v. A. Phillip Randolph Inst.,* 138 S. Ct. 1833 (2018)

*Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018)

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016)

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013)

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)

*Whitmore v. Arkansas,* 495 U.S. 149 (1990)

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974)

**Non-Sixth Circuit Court of Appeals authority**

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019)

*Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014)

*Daughtrey v. Carter*, 84 F.2d 1050 (D.C. Cir. 1978)

**Sixth Circuit Court of Appeals authority**

*Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977 (6th Cir. 2020)

*Buchholz v. Tanick*, 946 F.3d 855 (6th Cir. 2020)

*Doe v. Dewine,* 910 F.3d 842 (6th Cir. 2018)

*Parsons v. United States DOJ*, 801 F.3d 701 (6th Cir. 2015).

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014)

*Coal Operators and Asscs., Inc. v. Babbitt*, 291 F.3d 912 (6th Cir. 2002)

*Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997)

**Other Federal authority**

*American Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2015)

*NAACP v. Lawson*, No. 117-cv-02897-TWP-MPB, 2020 WL 4904816 (S.D. Ind. Aug. 20, 2020)

## INTRODUCTION

The National Voter Registration Act of 1993 (NVRA) was enacted, in part, "to increase the number of eligible voters" and to enhance participation in the electoral process.  52 U.S.C. § 20501(b).  Certainly, these purposes are balanced against equally laudable goals of protecting the integrity of the electoral process, and maintaining accurate and correct voter registration rolls, *id.*, but it is a balance.  The amended complaint fails to identify any action taken against Plaintiff, or any policy, procedure, or law at play in Michigan that counteracts the NVRA's goal of electoral integrity.

This is equally true with respect to section 8 of the NVRA, which is primarily at issue here.  This section requires only that a state conduct a general program, which is "uniform, non-discriminatory" and makes a "reasonable effort to remove the names of ineligible voters" from the official voter registration list by reason of the voter's request, notice of death, or change of residence after certain precautions are taken. 52 U.S.C. § 20507(a)(4), (b), (d), (e).  The NVRA does not require a state enact an exhaustive program to remove every ineligible voter, but instead, actually prohibits the state from removing voters systematically within ninety (90) days before a Federal election or immediately for reasons other than death or by request.  *See Husted v. A. Phillip Randolph Inst.,* 138 S. Ct. 1833 (2018); *Bellitto v. Snipes*, 935 F.3d 1192, 1201, 1207 (11th Cir. 2019).  As explained below, Michigan's election law provides such a program— and there is no allegation of action taken against Plaintiff or by Defendant Secretary Benson or Director Brater to contradict this.

Nor are there sufficient allegations to demonstrate Plaintiff's standing to bring these claims. The NVRA's private right of action comes in the context of, and not as an alternative to,

this Court's Article III jurisdictional boundaries.  Plaintiff has not alleged sufficient factual basis

for standing to invoke this Court's jurisdiction.

Michigan values a robust democracy and takes seriously its list-maintenance

responsibility.  But Plaintiff has not alleged a cognizable injury-in-fact, fairly traceable to

Defendants' conduct or redressable by a favorable judicial decision to authorize this Court's

jurisdiction over any claim to the contrary.  This Court should grant Defendants' motion and

dismiss this case.

**STATEMENT OF FACTS**

**A.      Overview of NVRA's list maintenance requirements.**

The NVRA was enacted "to establish procedures that will increase the number of eligible

citizens who register to vote in elections for Federal office," "to make it possible for Federal,

State and local governments to implement this Act in a manner that enhances the participation of

eligible citizens as voters for Federal office," "to protect the integrity of the electoral process,"

and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. §

20501(b).  Section 8 of the NVRA, codified in 52 U.S.C. § 20507, provides several procedures

or other requirements to be carried out by participating states with respect to the administration

of voter registration.  This includes efforts aimed at insuring "each eligible applicant" is

registered to vote in an election and taking precautions against hasty removals of registrants from

voter rolls.

Of particular relevance here, section 8 of the NVRA requires a state to notify voters of

the disposition of an application for registration,  52 U.S.C. § 20507(a)(2), and prohibits the

removal of a name of a registrant except in narrow circumstances, i.e., at the registrant's request,

"as provided by State law, by reason of criminal conviction or mental incapacity," or through a

2

"general program that makes reasonable efforts to remove" the names of voters rendered ineligible by death or upon a change of address. 52 U.S.C. § 20507(a)(3), (4).

The NVRA does not require states to comply with any particular program or to immediately remove every voter who may have become ineligible.  Rather, a state must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . (A) the death of the registrant; or (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) [of ]" 52 U.S.C. § 20507(a)(4)(A)-(B).

Subsection (b) requires that the program implemented to remove voters under subsection (a)(4) be a "nondiscriminatory" program, 52 U.S.C. § 20507(b)(1), and "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote" except:

> (2) . . . that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual-- from the official list of eligible voters if the individual—
>
> (A) has not either notified the applicable registrar . . . or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then
>
> (B) has not voted . . . in 2 or more consecutive general elections for Federal office. [52 U.S.C. § 20507(b)(2).]

Subsection (c)(1) sets forth an example of a program for the removal of ineligible voters from the registry that is based on using "change-of-address information supplied by the Postal Service[.]" 52 U.S.C. § 20507(c)(1).  A state *may* comply by utilizing change-of-address information from the United States Postal Service; however, this is not the only way by which a state can achieve compliance. *Husted*, 138 S. Ct. at 1847. Thus, under subsection (c), a state may

implement a program described in subsection (c)(1), or a state may craft its own voter removal

program in order to comply with subsection (a)(4).

   With respect to any removal program, however, a state must generally complete any

program to remove voters from official lists not later than 90 days before a primary or general

election for Federal office:

> (2)(A) A State shall complete, not later than 90 days prior to the date of a primary
> or general election for Federal office, any program the purpose of which is to
> *systematically remove* the names of ineligible voters from the official lists of
> eligible voters.
>
> (B) Subparagraph (A) shall not be construed to preclude--
> (i) the removal of names from official lists of voters on a basis described in
> paragraph (3)(A) or (B) or (4)(A) of subsection (a); . . . . [Emphasis added.]

   Thus, a systematic removal program must be concluded 90 days before a Federal

election, but this provision does not preclude removing particular voters who request to be

removed or become ineligible based on a criminal conviction, *see* § 20507(a)(3)(A)-(B), or who

have died, *see* § 20507(a)(4)(A).

   Subsection (d) addresses the removal of names from the official registration list.

Subsection (d)(1) sets forth a prohibition with two exceptions. The statute prohibits a state from

removing the name of a registrant on the grounds of a change of residence unless one of two

situations exists:  *First*, where the registrant confirms in writing that the registrant has moved out

of the registrar's jurisdiction. *Second*, where the registrant fails to respond to a specific type of

notice sent by the registrar in conformity with subsection (d)(2), and the registrant has not voted

in the previous two general elections following the transmission of the notice to the registrant.

52 U.S.C. § 20507(d)(1)-(2).  If a registrar receives change of residence information under (d)(1)

and (2), the registrar "shall correct" the voter registration list.  52 U.S.C. § 20507(d)(3).  But if

4

confirmation is not received, there is a time-lag built into the statute before a voter's name may be removed.  Specifically, a state must have either written confirmation that the registrant has changed residence to a location outside of his/her jurisdiction, or two federal elections have passed without the registrant voting during this period of time, the registrant received notice that s/he would be removed from the official voter file if s/he did not confirm an accurate address and registration information.  52 U.S.C. § 20507(d)(1)-(2).

In addition to NVRA, the federal Help America Vote Act (HAVA) of 2002 provides that "each State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State. . . ."  52 U.S.C. § 21083(a)(1)(A).  Moreover, § 21083(a)(1)(A)(viii) states that "the computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."  Michigan complied with these requirements long ago when it created the qualified voter file (QVF) as the State's computerized statewide voter registration list.  Mich. Comp. Laws §§ 168.509m(1)(a), 168.509o, 168.509p, 168.509q, 168.509r.  HAVA further requires that "the list maintenance performed . . . shall be conducted in a manner that ensures that . . . only voters who are not registered or who are not eligible to vote are removed from the computerized list." 52 U.S.C. § 21083(a)(2)(B)(ii). Additionally, § 21083(a)(4)(B) of HAVA provides that "the State election system shall include provisions to ensure that voter registration records are accurate and are updated regularly, including . . . safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters."  The HAVA provisions essentially parallel or incorporate NVRA.

5

**B.      Michigan's general list maintenance practices.**

After NVRA was enacted, Michigan made a significant number of amendments to the

Michigan Election Law, Mich. Comp. Laws §§ 168.1 *et seq*., in order to incorporate or come into

compliance with its requirements.  Most of these changes to the law originated in 1994 P.A.

441.[1]  Section 509n makes the Secretary of State responsible for coordinating the requirements

under NVRA.  Mich. Comp. Laws, § 168.509n.

**1.      Deceased voters**

With respect to the deaths of registered voters, section 509o requires the Secretary of

State to "develop and utilize a process by which information obtained through the United States

Social Security Administration's death master file that is used to cancel an operator's or

chauffeur's license . . . or an official state personal identification card . . . of a deceased resident

of this state is also used at least once a month to update the qualified voter file to cancel the voter

registration of any elector determined to be deceased."  Mich. Comp. Laws § 168.509o(4). The

Secretary must also "make the canceled voter registration information . . . available to the clerk

of each city or township to assist with the clerk's obligations under section 510."  (*Id.*) [2]  *See also*

Mich. Comp. Laws § 168.509z(c) ("The secretary of state shall notify each clerk of the following

---

[1] *See generally*, Mich. Comp. Laws §§ 168.509m, 509n, 509o, 509p, 509q, 509r, 509t, 509u, 509v, 509w, 509x, 509z, 509aa, 509bb, 509cc, 509dd, 509ee, 509ff, and 509gg.
[2] Under section 510, "[a]t least once a month, the county clerk shall forward a list of the last known address and birth date of all persons over 18 years of age who have died within the county to the clerk of each city or township within the county. The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors."  Mich. Comp. Laws § 168.510.  County clerks act as the local registrar for purposes of maintaining vital records and statistics, such as deaths.  Mich. Comp. Laws §§ 333.2804(4), 333.2815, 333.2833.

information regarding residents or former residents of the clerk's city or township . . . death notices received by the secretary of state.")

### 2.    Address changes

As to changes of address, section 509z requires the Secretary to "notify each clerk of the following information regarding residents or former residents of the clerk's city or township . . . [d]river license or state personal identification card changes of address received by the secretary of state, and whether the person submitted an application for the new address."  Mich. Comp. Laws § 168.509z(a).  The Secretary must also provide the "names and addresses in this state of persons who have been issued a driver license in another state."  Mich. Comp. Laws § 168.509z(b).  These sections are consistent with section 509o(5), which requires the Secretary to "participate with other states in 1 or more recognized multistate programs or services . . . to assist in the verification of the current residence and voter registration status of electors."  Mich. Comp. Laws § 168.509o(5).  The Secretary must then "follow the procedures under section 509aa(5) with regard to any electors affected by information obtained through any multistate program or service."  (*Id*.)

Under section 509aa, a "clerk may use change of address information supplied by the United States postal service or other reliable information received by the clerk that identifies registered voters whose addresses may have changed as provided in this section."  Mich. Comp. Laws § 168.509aa(1).  Section 509aa goes on to provide for how a clerk must proceed if the clerk receives "reliable information" that a voter has "moved his or her residence" either "within the city or township," § 509aa(2)(a)-(c), or "to another city or township," § 509aa(3)(a)-(c). In both cases, the voter must be sent a notice that requests the voter to verify or correct the address information within 30 days before the next election.  If notices are returned as undeliverable to

the issuing clerk under either § 509aa(2) or (3), "the clerk shall identify the registration record of a voter as challenged[.]"  Mich. Comp. Laws § 168.509aa(4).  Similarly, subsection 509aa(5) provides that "[i]f the department of state receives notice that a registered voter has moved out of state by receiving a surrendered Michigan driver license of that registered voter, the secretary of state shall send" to the voter notice that requests the voter to verify or correct the address information within 30 days before the next election.  Mich. Comp. Laws § 168.509aa(5).  For voters who receive notices under § 509aa(3) (in-state move to another jurisdiction) or § 509aa(5) (out-of-state move), the voters must receive information that their registrations will be cancelled after the second November general election after which the notice was sent.[3]  The sending of these notices to these voters starts the cancellation countdown clock running.[4]

Under section 509r(5), the Secretary must create and maintain "an inactive voter file." Mich. Comp. Laws § 168.509r(5).  Section 509r provides that voters who fail to confirm residency information must be placed in the inactive file:

> (6) If an elector is sent a notice under section 509aa to confirm the elector's residence information or if an elector does not vote for 6 consecutive years, the secretary of state shall place the registration record of that elector in the inactive voter file. The registration record of that elector must remain in the inactive voter file until 1 of the following occurs:
>
> (a) The elector votes at an election.
>
> (b) The elector responds to a notice sent under section 509aa.
>
> (c) Another voter registration transaction involving that elector occurs. [Mich. Comp. Laws § 168.509r(6).]

---

[3] A list of voters who have received notices under section 509aa must be made available for inspection by the Secretary and/or local clerks.  Mich. Comp. Laws § 168.509ff(1)-(2).
[4] *See* Election Officials' Manual, Chapter 2, Voter Registration, pp 15-22, available at https://www.michigan.gov/documents/sos/II_Voter_Registration_265983_7.pdf.

However, "[w]hile the registration record of an elector is in the inactive voter file, the elector remains eligible to vote and his or her name must appear on the precinct voter registration list." Mich. Comp. Laws § 168.509r(7).  If a voter on the inactive voter file "votes at an election by absent voter ballot, that absent voter ballot must be marked in the same manner as a challenged ballot . . . ."  Mich. Comp. Laws § 168.509r(8).

Local clerks are authorized to conduct programs to remove names from the QVF. Section 509dd provides that a "clerk may conduct a program . . . to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township."  Mich. Comp. Laws § 168.509dd(1).  Such a program must be uniformly administered and comply with the NVRA, including the requirement that any program be concluded 90 days or more before a federal election, except for removals done at the request of the voter, upon the death of a voter, or "[u]pon notice that a voter has moved from the city or township and has completed an application at the new address."  Mich. Comp. Laws § 168.509dd(1), (2)(a)-(c).  To conduct a removal program, a local clerk may conduct a house-to-house canvass, send a general mailing to voters for address verifications, or participate "in the national change of address program established by the postal service."  Mich. Comp. Laws § 168.509dd(3).

## STANDARD OF REVIEW

In a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(1) and (6), this Court must accept as true the allegations of the amended complaint and then determine whether the statements are sufficient to make out a right of relief.  *United States v. Gaubert*, 499 U.S. 315, 327 (1991).  Although the Court must accept well-pled facts as true, the Court is not required to accept a plaintiff's legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S.

662, 677 (2009).  To survive dismissal, Plaintiff's claim must be plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Thus, in evaluating the sufficiency of Plaintiff's pleadings, this Court may make reasonable inferences in the non-moving party's favor, "but [this Court is] not required to draw [P]laintiffs' inference."  *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).  Conclusory allegations are "not entitled to be assumed true."  *Iqbal*, 556 U.S. at 681.

## ARGUMENT

Dismissal is fundamentally necessary because the allegations in the complaint, even as amended, fail to pass the threshold for this Court's jurisdiction—standing.   Even if Plaintiff's February 26, 2020 letter to Defendants Secretary Benson and Director Brater was sufficient to provide notice required by the NVRA, the allegations in the amended complaint do not allege a cognizable injury-in-fact that Mr. Daunt, himself, suffered, and which is fairly traceable to any conduct by either State Defendant or which would be redressable by a decision from this Court in his favor.  This Court lacks jurisdiction over the claims alleged in the amended complaint.  Moreover, as explained below, Plaintiff's allegations of vote dilution fail to state a claim upon which relief can be granted.  This Court should dismiss this case.

I.      **This Court lacks jurisdiction over claims brought by a Plaintiff who lacks standing.**

When the plaintiff lacks standing, this Court lacks jurisdiction and dismissal is warranted under Fed. R. Civ. P. 12(b)(1). *Taylor v. KeyCorp.*, 680 F.3d 609, 612-13 (6th Cir. 2012).  "It is well established… that before a federal court can consider the merits of a legal claim, the person seeking to invoke [its] jurisdiction … must establish the requisite standing to sue." *Whitmore v. Arkansas,* 495 U.S. 149, 154-55 (1990) (internal quotations omitted.)  And with good reason.  "[T]he standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002) (quoting *Coyne v. Amer. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (internal citations and quotations omitted.)).

Plaintiff can satisfy this requirement only by "clearly … alleg[ing] facts demonstrating" that: (1) he suffered an injury-in-fact; (2) such injury is "fairly traceable to the challenged conduct" of a named-defendant; and (3) such injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547-48 (2016) (internal quotations omitted).  These elements are "not mere pleading requirements," but an "indispensable part of plaintiff's case[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992).  The NVRA also includes an additional requirement to invoke this Court's jurisdiction.  Specifically, Congress authorized a private cause of action only by a person "aggrieved by a violation of [the NVRA]" and who provides "written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1).  Where, as here, Plaintiff's allegations fail to satisfy these elements, this Court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore,* 495 U.S. at 155-56.

11

Plaintiff's allegations of standing are, indeed, deficient.  As explained below, Plaintiff's counsel letter to the Secretary of State and Director of Elections does not satisfy the notice requirement of the NVRA.  Moreover, the amended complaint lacks any allegation of an injury-in-fact  particular to Plaintiff, much less one "fairly traceable" to any conduct by Defendants Benson or Brater, or which is likely to be redressed by the relief requested from this Court.

> **A.      The February 26, 2020 letter did not satisfy the necessary pre-requisite for asserting a private cause of action under the NVRA.**

Plaintiff's reliance on "statutory standing," based on his February 26, 2020 letter to Defendants Benson and Brater misses the mark.  (Ex. A to Am. Compl., Doc. 31-1, PageID.261-65.)  Certainly, the NVRA authorizes a private right of action—but only by the Attorney General or a "person aggrieved by a violation" of the NVRA.  52 U.S.C. § 20510(a), (b).  Absent an executive declaration from the state of its intent not to comply with NVRA federal courts consider this notice requirement a mandatory pre-requisite for an individual to establish standing to bring a claim.  *Scott v. Schedler*, 771 F.3d 831, 835 (5th Cir. 2014); *Ga. State Conference of the NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335-36 (N.D. Ga. 2012).  And its sufficiency is evaluated in light of the purpose for this requirement—which is to provide states in alleged violation of the act an attempt at compliance before facing litigation.  *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) ("Congress structured the notice requirement in such a way that notice would provide states in violation of the Act an opportunity to attempt compliance before facing litigation.")  Accordingly, the allegations in the notice must be specific enough to identify the allegedly aggrieved individual and the actions-or-lack-thereof, which aggrieved him.  *See Scott,* 771 F.3d at 836.

Plaintiff's February 26 letter does not identify any law, policy, or activity by the Secretary or the Director that could be considered non-compliance with the NVRA, much less

one that aggrieved him.  Notably, section 8 of the NVRA only requires that a state "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from official lists" by reason of the voter's request, death, or change of residence if certain precautions are taken.  52 U.S.C. § 20507(a)(4),(b),(d),(e).  It does not require that Michigan immediately remove every voter who may have become ineligible (in fact, several provisions prohibit or could be read as prohibiting this), nor does it require that Michigan's program be exhaustive. Federal courts have appropriately declined invitations to interpret the statute's plain language as requiring anything further than the "general program" required by the NVRA.  *See Husted,* 138 S. Ct. at 1847-48; *Bellitto*, 935 F.3d at 1201, 1207.

As explained above, Michigan has such a program, and Plaintiff's letter provided no basis for a finding that Michigan's program, or even a law or policy through which it was carried out, does *not* comply with the NVRA. Instead, Plaintiff identifies several counties where the number of registered voters exceeds the national average based on total voting age population. In other words, he provides notice to the Secretary and Director that he believes a high percentage of adults in Michigan counties are, indeed, registered to vote.  He bases this on a comparison between a 2014-2018 national census survey and data on voter registrants in those counties from an unspecified date.  Only one county allegedly exhibited voter registration rates that slightly exceeded the population—but this could be attributable to the mandatory delay in removing an eligible voter from the QVF under federal law—and he threatens a lawsuit if the Secretary does not take "specific actions to correct" this unspecified violation(s) of the NVRA. The letter does not identify any Michigan law, policy, or program that violates the NVRA.

Nor is there any allegation supporting a fact that Mr. Daunt was "aggrieved."  Mr. Daunt is identified as a Michigan registered voter—without any alleged connection to any of the

counties listed in the letter or the amended complaint.  There is no allegation supporting a claim of any action, policy or otherwise that aggrieved him and constituted noncompliance with the NVRA.  The letter fails to accomplish the purpose of the NVRA notice requirement and Plaintiff's complaint, even as amended, should be dismissed.

      **B.**      **Plaintiff's allegations fail on their face to allege Article III standing.**

More importantly, even if the February 26, 2020 letter satisfied the notice pre-requisite of the NVRA, this does not replace the requirement that the factual allegations in the amended complaint overcome the constitutional standing requirement, which is a threshold to this Court's jurisdiction.  And Plaintiff's amended complaint falls far short of this.

Mr. Daunt's primary claims of undermined confidence and fear of vote dilution or voter fraud express a generalized grievance of governmental conduct, and no concrete injury personal to him.  His alleged voluntary expenditures of time and resources, and alleged "fear" of voter fraud even if personal to him, are insufficient to establish an injury-in-fact.  And they are certainly insufficient to establish injuries fairly traceable to conduct by Defendants Secretary Benson or Director Brater, or injuries that could be redressable here.

      **1.**      **Daunt has not alleged a concrete injury, personal to him.**

The amended complaint is void of any factual allegation supporting a finding that Mr. Daunt "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)) (internal quotations and citations omitted).  Federal courts have "emphasized repeatedly" that the "injury-in-fact" element requires allegations of an injury that is "distinct and palpable" with respect to the Plaintiff and based on "actual or imminent" alleged harm. *Whitmore*, 495 U.S. at 155-56 (internal citations and

quotations omitted).  Allegations of a "conjectural, hypothetical or speculative" harm are not

sufficient.  *Id.*  Nor is it sufficient to allege an abstract injury which, if it even materialized,

would be shared by all citizens.  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208,

216-17 (1974).

Mr. Daunt brings his claim under the NVRA as, essentially, a concerned Michigan voter.

He alleges no harm or injury except that shared by all Michigan voters, if at all.  Specifically, the

amended complaint describes him as a "duly registered Michigan voter" who plans to vote in the

upcoming election.  (Am. Compl., Doc. 31, PageID.244-45, ¶ 8.)  While he alleges an active

allegiance in the Republican Party, and current service as an "officer and member of the

governing body of the Clinton County Republican Party, a member of the governing body of the

Michigan Republican Party, and the executive director of the Michigan Freedom Fund" (*id.*,

PageID.245, ¶ 10), none of these organizations is a named-Plaintiff in this case, or alleging any

injury from the purportedly high voter registration rates.  In fact, the county in which Mr. Daunt

apparently focuses his political efforts (i.e., Clinton County) is not named as a defendant in the

amended complaint or identified as a county with voter registration rates that exceed the national

average.  (*Id.*, PageID.11, ¶¶ 36-37.)

Federal courts across the nation routinely reject standing over generalized grievances of

governmental conduct such as this, which lack factual allegation(s) supporting a finding that the

plaintiff himself has been, or will be, distinctly harmed by the alleged government conduct.  *See*

*Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009) ("The Supreme Court has long held

that a plaintiff does not have standing 'to challenge laws of general application where their own

injury is not distinct from that suffered in general by other taxpayers or citizens.'"); *Bingham v.*

*Massachusetts*, 616 F.3d 1, 6-7 (1st Cir. 2010) (plaintiffs lacked standing because they failed to

show a personal injury from their alleged state's action affecting property rights); *Boschma v. BATFE*, No. CV 18-2623-VAP (KK), 2018 U.S. Dist. LEXIS 82789 (C.D. Cal. May 16, 2018) (plaintiff failed to allege injury-in-fact where no injury was distinct from that of the public-at-large).

This is no less true in cases like this, which are based on an allegedly unlawful expansion of the number of potential voters. *Daughtrey v. Carter* presents an apt example. 584 F.2d 1050 (1978). There, the D.C. Circuit Court of Appeals denied standing to a group of military veterans and others in the context of their challenge to a presidential proclamation that, among other things, allegedly extended voting rights to a group of persons whom plaintiffs believed should be excluded. *Id.* at 1055-56.

Like Mr. Daunt, the plaintiffs claimed the risk of vote dilution from "an unknown, relatively small number of persons who allegedly should be excluded, and who therefore should not be entitled to vote[]" and, like this Court should do here, the D.C. Circuit recognized this was insufficient to establish standing. The appellate court recognized that these plaintiffs claimed injury only in the context of their status as qualified voters, without any allegation that the challenged proclamation disfavored their voting rights vis-à-vis those of some other group. The court held that such allegations lacked a "discrete factual context" within which a "concrete factual injury" occurred and, therefore, was insufficient to demonstrate standing. *Id.* at 1055-57; (quoting *Schlesinger*, 418 U.S. at 208, 220-22)). In the Sixth Circuit, *Daughtery* has been applied to a state-law challenge brought by a plaintiff who stands in the same position as all others in the state. *See Moncier v. Haslem*, 1 F. Supp. 3d 854, 862-63 (E.D. Tenn. 2014) (denying standing to an individual when his allegations failed to demonstrate that he was treated

differently from any other voter in the state in the context of his challenge to a state election law), *aff'd* 570 Fed. App'x 553 (6th Cir. 2014).

The situation is little different when the challenge is brought under the NVRA. *American Civil Rights Union v. Martinez-Rivera* (*ACRU*) is instructive here. 166 F. Supp. 3d 779 (W.D. Tex. 2015). In this case, a non-profit organization sued a tax assessor-collector on the grounds that allegedly high voter registration rates in her county demonstrated non-compliance with the NVRA. *Id.* at 796. ACRU claimed both organizational and associational standing, and the latter—which evaluated whether the organization's members would have standing—was denied. The magistrate found that "complaints of undermined confidence and potential vote dilution are nothing but a generalized grievance about government," and not sufficient to "state an Article III case or controversy." *Id.* at 803, quoting *Lujan*, 504 U.S. at 573. This decision was upheld and adopted by the Article III judge. *American Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. Mar. 30, 2015).

A similar result applies here. The allegations in the amended complaint demonstrate that Mr. Daunt's claims are nothing more than a generalized grievance about government conduct—and are insufficient to demonstrate standing. This is apparent when viewed in comparison to other cases where individuals demonstrated standing. For example, Mr. Daunt does not allege that he was improperly removed from the voter registration list, *see Bell v. Marinko,* 367 F.3d 588, 590-91 (6th Cir. 2004), that a problem occurred with his voter registration application, *see McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000); *Charles H. Wesley Educ. Found., Inc. v. Cox,* 408 F.3d 1349, 1352 (11th Cir. 2005), or even that a registration form was not available to him in the manner or at the location required under the NVRA. In fact, he does not even allege

any connection, such as a residence, place of work or political endeavors in the counties that he complains exhibit high voter registration rates.

Notably, his claim that he "must spend more of his time and resources monitoring Michigan elections for fraud and abuse, mobilizing voters to counteract it, educating the public about election integrity issues,… persuading elected officials to improve list maintenance," and on "get-out-the vote-efforts" does not substitute for the lack of personal or particular injury. (Am. Compl., Doc. 31, PageID.245-46, ¶ 11.)  These allegations demonstrate, at best, that Mr. Daunt believes he must participate in our democratic form of government because a high percentage of voters are, indeed, registered to vote.  Based on his extensive alleged affiliation with the Republican party both historically and in the present, it is questionable whether he would have not participated in such efforts anyway.  Regardless, for purposes of this motion, expenditure of resources is not sufficient in-and-of-itself to constitute an injury-in-fact when the resources would have been directed in this way anyway.  *Cf. Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977, 982 (6th Cir. 2020) (spending money to address voting inequities did not divert money from organization's mission but diverted money to its mission and, therefore, did not constitute an injury-in-fact necessary for standing); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014) (rejecting claim of standing based on "diversion of resources" theory).  It is Mr. Daunt's choice to  devote resources to political activities, and this is a choice faced by all Michigan residents, not one sufficient to create a concrete injury-in-fact, particular to Mr. Daunt and sufficient to satisfy the standing requirement.

> **2.      Even the alleged, personal "fear" is not a cognizable injury-in-fact.**

The allegations in the amended complaint that could be read as alleging an injury personal to Mr. Daunt fare little better.  His purported "undermine[d] confidence" in Michigan

elections (*see* Am. Compl., Doc. 31, PageID.245, ¶ 9), is an alleged intangible emotion insufficient to form a concrete injury-in-fact necessary to infer standing.  *Buchholz v. Tanick*, 946 F.3d 855, 863 (6th Cir. 2020) (alleged anxiety from alleged violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* insufficient to constitute "concrete injury" necessary for standing).  Put another way, an alleged "psychological consequence presumably produced by observation of conduct with which one disagrees" is insufficient to constitute a concrete injury-in- fact necessary to establish standing.  *Valley Forge Christian Coll.*, 454 U.S. at 485-86.  "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy" but by a showing of a concrete injury-in-fact suffered as a consequence of the alleged constitutional error.  *Id.*

> **3.** **Any concrete injury that may be alleged lacks sufficient imminency or a fair traceability to a Defendant's conduct.**

Not only has Mr. Daunt failed to allege a concrete, particularized injury-in-fact, but even the generalized claim of vote dilution is neither imminent nor fairly traceable to the State Defendants' conduct.  The standard for imminence is not a reasonable likelihood but, rather, whether such injury is "certainly impending."  *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409, 414, n.5 (2013).   Moreover, to satisfy the second prong of the Article III standing test, Mr. Daunt must allege that this vote dilution was "fairly traceable" to alleged conduct by the Secretary of State or Director Brater.  *Parsons v. United States DOJ*, 801 F.3d 701, 713-14 (6th Cir. 2015).

Mr. Daunt's allegations fall short of this standard on both fronts because the threatened harms of voter fraud or vote dilution rest on other people's conduct.  His vote in November could theoretically be diluted but *only if* ineligible voters vote in the federal election.  A theory of standing that "rest[s] on speculation about the decisions of independent actors" is not something

19

the Supreme Court easily endorses.  *Clapper,* 568 U.S. at 413-14.  This is true even when the independent third-party's conduct is illegal or morally reprehensible.  *See Allen v. Wright*, 468 U.S. 737, 757-59 (1984) (denying standing to challenge IRS tax-exemptions to private schools that allegedly engaged in illegal, discriminatory practices because the "line of causation" between tax exemption and discriminatory conduct of private schools was tenuous at best).  It is equally true when the third-party's conduct is the subject of regulation by the named-defendant. *See Simon v. E. Ky Welfare Rights Org.*, 426 U.S. 26 (1976).  While the causation element of standing is not impossible to satisfy in allegations like this, where the alleged injury is indirectly related to the defendants' conduct, it is more difficult.  The chain of events connecting the defendants' conduct to the alleged harm must be succinct, and not speculative.  *See Meese v. Keene,* 481 U.S. 465, 473-75 (1987) (no standing to claim direct First Amendment violation based on government's label of films as propaganda because label did not prohibit plaintiff from obtaining or exhibiting the films, but allegations sufficient to demonstrate standing for claims based on "chill" because the label risked harming his reputation).

In this case, the chain-of-events between the alleged failure to remove any ineligible voter from the official voter file and dilution of Plaintiff's individual vote, or fraud, is far too tenuous to demonstrate Article III standing.  For Plaintiff's vote to potentially be diluted by ineligible voters, ineligible voters will have to vote.  But Michigan takes significant precautions to protect against such conduct.  With respect to deceased voters, someone attempting to vote in person as a deceased voter could not vote without presenting photo identification or affirming that the voter lacks such identification, which renders the voter subject to a potential challenge. Mich. Comp. Laws § 168.523(1)-(2).  As far as attempting to vote an absent voter ballot as a deceased voter, the fraudulent voter would have to escape multiple signature checks by the local

20

clerk or election officials; first, as to the application for an absent voter ballot, [5] *see* Mich. Comp. Laws §§ 168.759(4),  168.761(1)-(2), and second, as to the absent voter ballot itself, *see* Mich. Comp. Laws §§ 168.764a, 168.766(1)-(2), 168.767.  For voters suspected of moving outside of a jurisdiction, if the required notices have been returned as undeliverable, the voters must be challenged if they appear to vote, whether in person or by an absent voter ballot, in the jurisdiction and confirm their address before voting.  Mich. Comp. Laws §§ 168.509aa(2)-(4), 168.509r(8).  Further, any elector in a jurisdiction may challenge the registration of any other registered elector in the jurisdiction under Mich. Comp. Laws § 168.512 and 168.727(1)-(3). These are just a few examples of the many statutes that protect against improper voting, and which demonstrate that Plaintiff's concerns over vote dilution as a result of any alleged failure to immediately remove ineligible voters is far-fetched.  Mr. Daunt has not specified what, if any, legally-required steps Defendants should have taken, but did not take, that would prevent these feared ineligible voters from casting ballots.

### 4.    A favorable ruling would not redress any alleged injury.

For much the same reasons as Plaintiff's claim is not fairly traceable to Defendants' conduct, it is not redressable by a judicial decree.  "The relevant standard [here] is likelihood – whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *Doe v. Dewine,* 910 F.3d 842, 850-51 (6th Cir. 2018) (quoting *Friends of*

---

[5] Contrary to Plaintiff's contention, the online absentee ballot application does not dispense with the requirement that the absentee ballot application be signed, or that the local clerk compare the signature on the absentee ballot application to the voter's signature in the qualified voter file. The process uses the voter's electronic signature stored in the QVF.  This process is currently the subject of state-court litigation in *Election Integrity Fund, et al., v. Jocelyn Benson,* Michigan Court of Claims Case No. 20-169-MM.

*the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 181 (2000).)  The concern is not so much with the Court's judicial decree but, rather, the "value of the judicial pronouncement," i.e., that it can serve as a "proper judicial resolution of a 'case or controversy'" as opposed to a mere advisory opinion.  *Id*. (internal citations omitted.)  In other words, the allegations of the amended complaint must demonstrate that Plaintiff himself would personally benefit from this Court's decision.  *Id.*  Absent an order requiring the Secretary of State or Director of Elections to violate federal law, the best this Court could provide is an advisory opinion.

First, as explained above, the alleged harms of vote dilution and voter fraud, and Plaintiff's fears or expenditures of resources and time devoted to protecting from these concerns, are caused by actions of third-parties, to wit, ineligible voters who bypass the other procedural safeguards discussed above to vote illegally in the upcoming federal election.  "Redressability is typically more difficult to establish where the prospective benefit to plaintiff depends on the actions of independent actors."  *Parsons*, 801 F.3d at 715-16.  And that applies with full force here.

The injunction sought by Plaintiff is, essentially, a requirement that Defendants comply with section 8 of the NVRA.  (Am. Compl., Doc. 31, PageID.258).  An order requiring Defendants comply with the law (if, in fact, this Court found that Defendants were not) would only require the implementation of a  "general program that makes reasonable efforts to remove" the names of voters rendered ineligible by death or upon a change of address.  52 U.S.C. § 20507(a)(3), (4).  Section 8 of the NVRA does *not* require, or even allow, a state to implement an exhaustive program that immediately removes every person ineligible for any reason, including possible relocation.  Mr. Daunt's alleged fear of vote dilution, voter fraud, and alleged increased efforts to prevent the same would in no way be alleviated—even if such allegations could be

considered sufficiently concrete, particularized injuries otherwise sufficient to justify this Court's Article III standing.  The risk that an ineligible voter would vote in the upcoming election remains.

Second, even if Plaintiff could demonstrate an injury and justify some relief, it is difficult to envision what relief this Court could grant before the November 3 election that would not, itself, violate the NVRA.  The NVRA prohibits states from systematically removing voters from the official registration lists within 90 days before a federal election—and Michigan is now less than 20 days away from the November general election  States can remove voters during this time period only if the voter specifically requests it or the voter passes away.  52 U.S.C. § 20507(a)(3)-(4).  In addition, states are prohibited from removing a voter from the official registration lists due to a change-in-residence without adequate confirmation of the same, and due to the voter's failure to participate in an election unless the voter fails to participate in two consecutive federal elections and notice is provided to the voter during this eight-year period.  52 U.S.C. § 20507(d).

In sum, the allegations of the amended complaint—even if true—do not establish standing.  Plaintiff's notice letter does not provide adequate information that would alert Defendants to action or inaction that was allegedly not in compliance with the NVRA. Moreover, even if notice was sufficient, Mr. Daunt has not identified any concrete, particularized injury-in-fact, fairly traceable to the State Defendants' conduct, that would be redressable by a favorable decision in this Court.  His allegations are insufficient to demonstrate standing over these claims and, accordingly, his amended complaint should be dismissed.

**II.     Plaintiff's claim of vote dilution fails as a matter of law.**

Even if Plaintiff could somehow establish standing, it bears emphasis that Plaintiff's request for relief on a vote dilution theory fails as a matter of law.  He has failed to allege sufficient facts to support a vote dilution claim or injury.   There is no indication from the amended complaint that Plaintiff is a member of a sub-group of the population, whose vote will be diluted by voting of the majority.  Put another way, there is no allegation that the groups with which Plaintiff identifies for purposes of this amended complaint, i.e., Michigan's registered voters and Republicans, are a minority for the population at-large or at risk of having their vote diluted by actions of the majority.  At least in the context of redistricting cases, such allegations are necessary for seeking relief for alleged vote dilution.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018).  Without such allegations, Plaintiff has failed to state a claim upon which relief can be granted and, as such, dismissal is warranted.  Fed. R. Civ. P. 12(b)(6); *Twombly*, 550 U.S. at 570 (holding that a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").

## CONCLUSION AND RELIEF REQUESTED

The allegations in the amended complaint, even if true, do not pass the necessary threshold for invoking this Court's jurisdiction—standing.  Plaintiff's  February 26, 2020 letter was insufficient to satisfy the requirements of the NVRA and, moreover, he has not alleged an injury-in-fact that is fairly traceable to conduct by Defendants Secretary of State Benson or Director Brater, or which is likely redressable by a judicial decision in his favor.  Defendants Secretary Benson and Director Brater respectfully request that this Court grant this motion, dismiss Plaintiff's claims, and grant such other relief as the Court deems just and proper.

Respectfully submitted,

DANA NESSEL
Attorney General

*/s/Elizabeth R. Husa Briggs*
Elizabeth R. Husa Briggs (P73907)
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants Secretary of State
Benson and Director of Elections Brater
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  briggse1@michigan.gov
P73907

Dated:  October 14, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2020, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*/s/Elizabeth R. Husa Briggs*
Elizabeth R. Husa Briggs (P73907)
Assistant Attorney General
Attorney for Defendants Secretary Benson
and Director Brater
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659
Email:  briggse1@michigan.gov
P73907