UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ANTHONY DAUNT,

                    Plaintiff,


                                    DOCKET NO. 1:20-cv-522

vs.

JOCELYN BENSON, in her official
capacity as Michigan Secretary of
State; JONATHAN BRATER, in his
official capacity as Director of
the Michigan Bureau of Elections;
SHERYL GUY, in her official
capacity as Antrim County Clerk;
DAWN OLNEY, in her official
capacity as Benzie County Clerk;
CHERYL POTTER BROWE, in her
official capacity as Charlevoix
County Clerk; KAREN BREWSTER, in
her official capacity as
Cheboygan County Clerk; SUZANNE
KANINE, in her official capacity
as Emmet County Clerk; BONNIE
SCHEELE, in her official capacity
as Grand Traverse County Clerk;
NANCY HUEBEL, in her official
capacity as Iosco County Clerk;
DEBORAH HILL, in her official
capacity as Kalkaska County
Clerk; JULIE A. CARLSON, in her
official capacity as Keweenaw
County Clerk; MICHELLE L.
CROCKER, in her official capacity
as Leelanau County Clerk;
ELIZABETH HUNDLEY, in her
official capacity as Livingston
County Clerk; LORI JOHNSON, in
her official capacity as Mackinac
County Clerk; LISA BROWN, in her
official capacity as Oakland
County Clerk; SUSAN I. DEFEYTER,
in her official capacity as

1   Otsego County Clerk MICHELLE
    STEVENSON, in her official
2   capacity as Roscommon County
    Clerk; and LAWRENCE KESTENBAUM,
3   in his official capacity as
    Washtenaw County Clerk,
4

5                   Defendants.

6   _____/

7

8        TRANSCRIPT OF HEARING ON MOTION TO DISMISS AND

9              RULE 16 SCHEDULING CONFERENCE

10     BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

11                GRAND RAPIDS, MICHIGAN

12                  October 27, 2020

13

14  Court Reporter:          Glenda Trexler
                             Official Court Reporter
15                           United States District Court
                             685 Federal Building
16                           110 Michigan Street, N.W.
                             Grand Rapids, Michigan 49503
17

18  Proceedings reported by stenotype, transcript produced by

19  computer-aided transcription.

20

21

22

23

24

25

1    A P P E A R A N C E S:

2    FOR THE PLAINTIFF:

3         MR. CAMERON THOMAS NORRIS
          CONSOVOY MCCARTHY, PLLC
4         1600 Wilson Boulevard, Suite 700
          Arlington, Virginia 22209
5         Phone:  (865) 257-0859
          Email: cam@consovoymccarthy.com
6
     FOR THE DEFENDANTS SECRETARY OF STATE JOCELYN BENSON AND
7    DIRECTOR OF ELECTIONS JONATHAN BRATER:

8         MS. ELIZABETH R. HUSA BRIGGS
          MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
9         525 West Ottawa Street
          P.O. Box 30758
10        Lansing, Michigan 48909
          Phone:  (517) 335-7603
11        Email:  briggse1@michigan.gov

12   FOR INTERVENOR DEFENDANTS PHILIP RANDOLPH AND RISE, INC.:

13        MS. EMILY BRAILEY
          PERKINS COIE, LLP
14        700 13th Street, N.W., Suite 800
          Washington, DC 20005
15        Phone:  (202) 654-6200
          Email: ebrailey@perkinscoie.com
16
          MS. SARAH S. PRESCOTT
17        SALVATORE PRESCOTT, PLLC
          105 East Main Street
18        Northville, Michigan 48167
          Phone:  (248) 679-8711
19        Email: prescott@spplawyers.com

20   FOR THE INTERVENOR DEFENDANT LEAGUE OF WOMEN VOTERS:

21        MR. GEORGE B. DONNINI
          BUTZEL LONG, PC
22        150 West Jefferson Avenue, Suite 100
          Detroit, Michigan 48226
23        Phone:  (313) 225-7042
          Email: donnini@butzel.com

24

25

                                    Grand Rapids, Michigan

                                    October 27, 2020

                                    3:57 p.m.

                          P R O C E E D I N G S

         THE COURT:  All right.  We're here on the case of

Daunt against Benson, 1:20-cv-522, at the Rule 16.  There are

motions to dismiss pending from the State defendants as well as

one of the intervenors.

         Let's start with appearances and we'll go from there.

For the plaintiff?

         MR. NORRIS:  Good afternoon, Your Honor, Cam Norris

for the plaintiff, Mr. Daunt.

         THE COURT:  All right.  Thank you.

         And for the defendants?

         MS. BRIGGS:  Good afternoon, Your Honor,

Assistant Attorney General Elizabeth Husa Briggs on behalf of

Secretary of State Jocelyn Benson and Director of Elections

Jonathan Brater.

         THE COURT:  All right.  Thank you.

         For our intervenors who do we have?

         MS. BRAILEY:  Emily Brailey on behalf of

Philip Randolph and Rise, Inc.

         THE COURT:  Thank you.

         MS. PRESCOTT:  Good afternoon, Your Honor,

Sarah Prescott, local counsel for the same.

1          *MR. DONNINI:* And good afternoon, Your Honor,

2 George Donnini from Butzel Long on behalf of the intervenor

3 defendant League of Women Voters.

4          *THE COURT:* All right. Thank you.

5          For today's purposes if you use the microphone right

6 in front of you, you're probably going to be best off.

7 Especially if you want to stay masked, which is fine. It will

8 be easier for us to hear. Just sit down, pull the microphone

9 close. If anybody can't sit down in court -- and I get that,

10 lawyers are not used to sitting down in court -- feel free to

11 walk over to the podium and use the microphone there. Either

12 way.

13          We're here for the Rule 16, and, of course, that's a

14 scheduling conference. You know, I did want to hear from the

15 parties, especially the moving parties, on the motion to

16 dismiss. We had the original motion to dismiss directed to the

17 initial Complaint. At that time it wasn't clear to me anyway

18 whether the plaintiff would be seeking relief in advance of

19 next Tuesday's election or whether it was simply seeking relief

20 down the road in the fullness of time so to speak.

21          If I'm understanding it right, Mr. Norris, your

22 relief is directed to, you know, down the road and nothing

23 specific to next Tuesday. Is that right?

24          *MR. NORRIS:* Correct, Your Honor.

25          *THE COURT:* Okay. Then there was an

1    Amended Complaint and another response.  The reason I bring it
2    up is because, you know, I had reviewed the briefing and case
3    law in that first round, and, of course, now again in the
4    second round, I know the briefing isn't complete, but I have to
5    say it doesn't seem like a hard standing case to me.  It seems
6    like somebody like this plaintiff has standing, and if this
7    plaintiff doesn't, I don't know who does under a National
8    Voting Rights Act kind of claim.  And, frankly, I think the
9    only National Voting Rights Act case I saw in the briefing from
10   any of the moving parties is one that granted standing
11   ultimately.  It was the Texas case.  So I want to make sure I
12   understand where the moving parties are going on that, but I'm
13   not inclined, from what I've seen so far, to think that there's
14   much chance of a standing dismissal, at least on Rule 12.

15          So let me go to Ms. -- is it Ms. Briggs?

16          MS. BRIGGS:  That's fine, Your Honor.

17          THE COURT:  Okay.  Pull that forward and make sure I
18   understand at least the essence of where you are on it, and
19   then we'll talk to any of the moving parties on the intervening
20   side who want to address it as well.  Go ahead.

21          MS. BRIGGS:  Well, Your Honor, we do believe that
22   Mr. Daunt has not established standing.  And I would point
23   you -- I mean, if you're focusing on the Texas case in
24   particular, Mr. Daunt is not -- Mr. Daunt is an individual.
25   He's not --

1          THE COURT:  Well, let me start out with do you have

2     any National Voting Rights Act case other than the American

3     Civil Rights Union case?

4          MS. BRIGGS:  I don't believe so, Your Honor, but we

5     do have cases definitely dealing with --

6          THE COURT:  I get that, but under the NVRA that's the

7     only one I saw.  At least that's the only one you can think of

8     right now.

9          MS. BRIGGS:  Okay.

10          THE COURT:  And at the end of the day, at least some

11     plaintiffs had standing in that case, right?

12          MS. BRIGGS:  Not individuals, Your Honor.

13          THE COURT:  I said at least some plaintiffs had

14     standing in that case, right?

15          MS. BRIGGS:  Only the organizations.

16          THE COURT:  So some plaintiffs had standing in that

17     case.

18          MS. BRIGGS:  The organizations, but they did not have

19     the --

20          THE COURT:  Did some plaintiff have standing in that

21     case or not?

22          MS. BRIGGS:  Yes, but not as individuals.

23          THE COURT:  Okay.  So if Mr. Daunt joined an

24     organization he could have standing?  Is that the position?

25          MS. BRIGGS:  Well, the organization would have to be

1    the plaintiff.

2         *THE COURT:*  All right.  Anything else on the standing

3    argument from the State defendants?

4         *MS. BRIGGS:*  Well, we've also argued that we do not

5    believe his letter, the February 26th letter, is sufficient.

6    That he doesn't give sufficient notice as to what his actual --

7    he doesn't identify any policy or procedure or any -- basically

8    any reason by which the Secretary of State or the director --

9    why Michigan's general program are not sufficient under the

10   NVRA.

11        *THE COURT:*  All right.  Anything else on the State

12   side?

13        *MS. BRIGGS:*  Well, we don't believe that a

14   generalized -- we believe basically what he's shown is that --

15   and what he's alleged is that this is just a generalized

16   grievance.  He's just appearing just on behalf as a Michigan

17   voter and there's nothing specific.  He's not even alleging to

18   be representative or involved in any politics with respect to

19   the specific counties at issue or that he alleges are showing

20   erroneous, for lack of a better word, erroneous voter

21   registration numbers, so . . .

22        And Article III standing, Your Honor, does require

23   more than just a generalized grievance about an alleged problem

24   with government activity.  It does require a concrete and

25   direct injury.  And it does require something that could be

1    fairly redressable from this Court.

2           Mr. Daunt is not associated even or does not even

3    allege to be associated with many of the counties that he

4    claims the data showing that there's a problem with.  Under the

5    case law, Your Honor, as we briefed, that's a -- standing is a

6    threshold issue, and he's not established standing.

7           THE COURT:  Okay.

8           MS. BRIGGS:  Thank you.

9           THE COURT:  Thank you.

10          From the intervenors, I don't think that there was a

11   motion from the League of Women Voters, but there were from

12   some of the others.  So I don't know who would like to speak on

13   behalf of the moving parties on the intervenor side.

14          MS. BRAILEY:  Your Honor, I can speak.  This is

15   Emily Brailey on behalf of Philip Randolph and Rise.

16          THE COURT:  Okay.  Thank you.

17          MS. BRAILEY:  We largely agree with what Ms. Briggs

18   has stated.  We agree with everything in that motion to

19   dismiss, including about the generalized grievance issue and

20   that plaintiff doesn't have standing.

21          And I'll add that we also don't think there is an

22   injury in fact about -- related to voter fraud or vote

23   dilution.

24          THE COURT:  Or dilution?  Okay.

25          MS. BRAILEY:  Or vote dilution.  I think that -- you

know, we rest on the cases we cited in our brief.  There's a
lot of recent precedent where their complaints can't stand on
such small evidence of or no evidence of voter fraud.

*THE COURT:*  Do you have any National Voter Rights Act
case?  I don't think you cited the Texas case, but --

*MS. BRAILEY:*  That's correct, Your Honor.

*THE COURT:*  But do you have any other National Voter
Rights Act case --

*MS. BRAILEY:*  No, Your Honor, but I am happy to
provide --

*THE COURT:*  -- on voter registration?  Go ahead.

*MS. BRAILEY:*  I'm sorry.  I'm happy to provide
additional briefing if you would like us to do that.

*THE COURT:*  Do you know if there is any case?

*MS. BRAILEY:*  Not off the top of my head right now.

*THE COURT:*  All right.  Thank you.

*MS. BRAILEY:*  And in addition, you know, we also
think the remaining factors of standing including causation and
redressability cannot be met here.

And on top of that, I mean, I guess you're only
asking about standing right now, but we also have the 12(b)(6)
failure to state a claim.

*THE COURT:*  Yeah, go ahead.  You can touch on that
too if you want to.

*MS. BRAILEY:*  So, again, this goes back to vote

dilution and whether that can even be recognized as a claim in this context. And really it's only been addressed in the reapportionment cases. And even if it is recognized outside of those contexts, the plaintiff would need to show at least that he's part of a group that is purportedly having its votes diluted, and that just doesn't appear in this Complaint.

And finally, we echo a lot of what the State has in their motion to dismiss regarding the current list maintenance program and that there's just no evidence in that Complaint that Michigan is not already implementing a reasonable and adequate maintenance program.

THE COURT: All right. Thank you.

I don't know if -- I can't remember, Ms. Prescott, are you representing the League of Women Voters or are you representing the same groups or --

MS. PRESCOTT: The same groups, Your Honor.

THE COURT: Okay. Do you want to add anything on their behalf?

MS. PRESCOTT: No, I don't. Thank you.

THE COURT: All right. And from Mr. Donnini, I didn't see a motion from your clients. Do you want to have anything to say on this? And just stay seated if you do.

MR. DONNINI: Sure, Your Honor. It is a habit of mine.

Your Honor, we did file an Answer. I would just

1   point out that we believe also -- we believe the arguments in

2   the motions to dismiss that were filed are meritorious.  We

3   don't think that this states a valid claim upon which relief

4   can be granted.  And that is in our Answer.  However, we did

5   file an Answer and we are prepared to move forward if it does

6   survive, but for the arguments that have been made in court and

7   in the briefing, we agree that this case does not state a claim

8   and ought to be dismissed.

9           *THE COURT:*  All right.  I know your time to respond

10  hasn't fully run yet from the plaintiff's side, Mr. Norris, but

11  do you want to be heard at all today on where you're going with

12  that?  I know you touched in your earlier response on the

13  notice letter, not really on the other issues.

14          *MR. NORRIS:*  Thank you, Your Honor.  Just briefly.

15  Your Honor is correct that there have been NVRA cases in the

16  past filed under Section 8, and those cases have been litigated

17  past the 12(b) stage.  These are not cases that are normally

18  dismissed for lack of standing.

19          And one point that I would add to the prior case law,

20  I believe all the NVRA-specific cases that have been cited all

21  predate the Supreme Court's decision in Spokeo, which

22  Your Honor, I'm sure, is familiar with.  And in Spokeo the

23  Supreme Court made very clear as a holding for the first time

24  that Congress can actually affect how the Article III inquiry

25  works.  And here we have an express cause of action from

1    Congress that allows individuals to bring claims under

2    Section 8 of the NVRA.  That statute says individuals.  It

3    allows people like Mr. Daunt to sue if they file the requisite

4    presuit notice letter, as he did.

5           And as the Court explained in Spokeo, Congress can

6    elevate theories of causation and types of injuries that might

7    not otherwise satisfy Article III and by recognizing those

8    theories can make them satisfy Article III.  And we think

9    that's precisely the case with the NVRA.

10          But even aside from Spokeo, even pre-Spokeo these

11   types of claims are cognizable and plaintiffs have standing to

12   bring them, like Mr. Daunt does.

13          *THE COURT:*  All right.

14          *MS. BRIGGS:*  May I respond, Your Honor?

15          *THE COURT:*  Go ahead.  Sure.

16          *MS. BRIGGS:*  The private cause of action authorized

17   under the NVRA is only available to a person who has been

18   aggrieved, and Mr. Daunt has not shown any way in which he's

19   been aggrieved.  Or at least there's not any factual allegation

20   even in the Complaint as amended that supports that.

21          Secondly, I would point you to page 17 in the State's

22   brief, page ID 320, where we identify and distinguish cases in

23   which -- we distinguish Mr. Daunt's allegations from those in

24   which the Sixth Circuit and the other circuits have found

25   standing in the context of the NVRA.  And so we have addressed

1    that as well, Your Honor.

2        Mr. Daunt's allegations in his Complaint even as

3    amended don't rise to that level.  He's not shown that he's

4    aggrieved.

5        THE COURT:  All right.  And anything else,

6    Ms. Brailey?

7        MS. BRAILEY:  Yes, Your Honor.  We agree that he has

8    not alleged that he's aggrieved, but on top of that, as we

9    mentioned in our brief on page 3, we also argue that

10    Article III standing is a requirement in and of itself in

11    addition to being aggrieved under the statute.  And I would

12    also like to note that, you know, after the response we would

13    like the opportunity to have a reply and we can provide an

14    NVRA-focused brief if that would be helpful to the Court.

15        THE COURT:  All right.  Well, I don't think any

16    additional briefing is needed at this stage, to tell you the

17    truth.  And, of course, a ruling on a motion under Rule 12

18    doesn't mean it's the end of the issue.  Rule 56 is always

19    there.  But for Rule 12 purposes I don't think there's any

20    reason to go forward with further briefing because I think the

21    motions as they stand need to be denied.

22        I think there's clear standing established as a

23    matter of allegations here and at least a plausible claim

24    stated, which is all that needs to be happening at this stage

25    of the case.  And I'll just briefly articulate why I think

that's the case.

The parties are, of course, correct in their briefing that you need under 52 U.S.C. § 2510 a person aggrieved, and then, of course, under Article III of the Constitution somebody is aggrieved that still satisfies the constitutional requirements of standing.

In addition, under the National Voter Registration Act you'd also have to show that the individual involved or the person aggrieved satisfied the notice requirement. I think they are all established here. At least as a matter of pleading. Which doesn't mean that the plaintiff ultimately prevails but does, I think, mean that the plaintiff gets to go beyond where they are right now.

With respect, first of all, to the notice letter, the notice letter is attached to the First Amended Complaint, and it's, in my view, a fairly detailed statement of why the plaintiff thinks that there's a problem with the Michigan voter registration lists and in particular that the defendants haven't followed through on their obligation to come up with under Section 8 an appropriate general program to remove voters that don't belong on the registration list because they have moved or because there has been a death. And I don't think it's incumbent on the plaintiff in a notice letter to say "Here is the existing program of the state and here are the particular flaws in it." I think it is simply incumbent on the

plaintiff to say "Here is why I think there's a problem and why
I don't think whatever program you're using, if any, is up to
the task."

        And certainly on the face of things, at least in
Leelanau County if you have more registered voters than
eligible voters living, at least based on the census data, a
reasonable inference, or at least a plausible inference is
there's a problem with the system that's been used to address
the voter registration list.  And there's additional specific
examples given.  I don't know if those numbers are going to
hold up.  I don't know if that's going to be explained in some
other fashion.  But I do think for purposes of a notice letter
as well as the allegations of the First Amended Complaint which
largely repeat that detail, there's at least a plausible case
for a problem with the Section 8 obligation.  And whether or
not the State has a program, whether or not it's implemented a
program, and whether or not it's reasonable, those are merits
issues that, of course, aren't decided today and the plaintiff
may ultimately not prevail, but I think they have done enough
to get that far.

        What the plaintiff's First Amended Complaint includes
in addition to what's in the notice letter is additional
factual basis that the plaintiff says illustrates the reasons
for their concern in terms of the I think it was about 500,000
or so returns that came back when the Secretary of State sent

out the absentee applications earlier. It was after the notice
letter but before the First Amended Complaint. And I think
that adds to the plausibility for purposes of the 12(b)(6) and
also gets into where we'll go next which is whether or not
Mr. Daunt is an aggrieved person under the statute and
sufficiently pleading a basis for standing with Article III.

I think that Mr. Daunt in the First Amended Complaint
really relies on three main categories of injury that he says
are concrete and particularized. He is a voter in the state of
Michigan. He is concerned about the possibility that his vote
would be diluted. But he's not only focused on that. He's
also concerned about the general cloud on the outcome of an
election if the registration lists aren't properly purged and
reflecting somebody -- or a list that's complied with the
Section 8 requirement. And he's concerned that he has to spend
extra time and effort policing the efforts of the secretary and
the director of elections to make sure these lists are where
they need to be and to make sure that the voting is coming off
properly. And I don't think that matters that he's doing so or
alleging his interest in doing so as an individual as opposed
to an organization. The fact that he is expressing the same
kind of concern that the organization did in the American Civil
Rights Union case from the Western District of Texas is, I
think, fundamentally the point. And he alleges a plausible
basis for why he as an individual voter in the state and active

in Republican politics in his case would be interested and
concerned about that, and for purposes of alleging injury I
think that's sufficient.

The point that the plaintiff makes about Spokeo and
the statutory cause of action is, I think, also important.
You know, I think so many of us, both at the bench and the bar,
from the Supreme Court point of view look at Spokeo as a case
that denied standing on a statutory claim or at least found it
inadequate as presently alleged and wanted to go back and have
the lower courts review it under the new standard.  And so it's
easily cited and I think to some extent potentially
misunderstood as a case that makes standing unusually difficult
for a plaintiff seeking to enforce a private right of action
under a congressional statute.  But in fact, as the
Ninth Circuit found on remand in Spokeo, 867 F.3d. 1108 in
2017, the fact that Congress makes a decision to create a
private right of action is something that the Court is
obligated under the Supreme Court's decision and then as
interpreted now by the circuits, Second Circuit, Ninth Circuit,
when the Congress says "We have the following interests," and
here we have a variety of interests at issue in the Voter
Registration Act, but two of them certainly are concerned with
exactly what Mr. Daunt says he's concerned with, the integrity
of the electoral process in ensuring that accurate and current
voter registration roles are maintained, when Congress lays

those out and says here is a private right of action for a
person aggrieved to enforce it, and that person, Mr. Daunt in
this case, comes forward, that's close to almost -- I won't say
a slam dunk -- but close to saying if not Mr. Daunt, then who?
This is exactly the kind of person that Congress had in mind to
protect these interests for the reasons that Mr. Daunt
articulates in the First Amended Complaint.

The intervenors are here, and I thought their claim
for intervention was clear enough because they are concerned
with also making sure that the other interests of the
National Voter Registration Act are recognized and enforced and
that we don't unduly purge voter roles, making it more
difficult for eligible citizens to register or to participate
in elections. They are both sides of the same coin, and I
think this is exactly the way Congress thought the interests
would be vindicated and protected on all sides. So for me when
you have a congressionally created private right of action like
this to address exactly the interests that Mr. Daunt says he's
suffering from a fear of losing, you have intervenors on the
other side who want to make sure things don't go off the rails
in removing people who deserve to be there or discouraging them
from registering, we have exactly the interests aligned that I
think Congress, first of all, had in mind and that the
Supreme Court in Spokeo and the circuits following Spokeo have
recognized as part and parcel of what's involved in a statutory

1    cause of action.

2         I already touched on the American Civil Rights Union

3    case which I think -- we might have missed something -- but I

4    think it's the only National Voter Registration Act case I saw

5    cited by anybody on the standing issue, did result in standing

6    for the plaintiff, albeit not on every theory advanced but

7    at least on multiple theories.  And the only other cases that I

8    saw outside of the NVRA context that talked about general

9    dilution or fear of dilution I think are all readily

10   distinguishable and that none of those arise under a situation

11   like the National Voter Registration Act where Congress has

12   articulated the private right of action and reasons for it.

13        The other case that I think was referenced of

14   interest in probably the State briefing, it might have been the

15   intervenors, was the Buchholz case from our circuit under the

16   Fair Debt Collection Practices Act where standing was not

17   recognized, but that's a perfect example of where the interests

18   that the party plaintiff was talking about was not within the

19   scope of the cause of action that Congress had set up, and I

20   think in that case the trial court here, Judge Quist, and then

21   the Sixth Circuit affirming him said, "No, that's not right.

22   We don't have Article III standing here even though you might

23   have a technical issue under the statute."  And that's because

24   in Buchholz the complaint was that the lawyers were harassing

25   the plaintiff by writing him letters, telling him he had to pay

on a debt that he didn't contest.  And undoubtedly that may have created anxiety, but not the kind of anxiety that was at the root of the Fair Debt Collection Practices Act.

And I think in this case the situation is quite different.  The concerns that Mr. Daunt articulates around potential for dilution, potential for a cloud on the election, and potential for extra work and resources policing the validity and propriety of the election are exactly interests that are within the scope of the NVRA, just as the interests the intervenors intend to protect are other interests on the other side of the NVRA coin.  So from my perspective there is proper notice in advance.  There is at least a plausible basis for a cause of action alleged under the National Voter Registration Act and a plausible basis for standing articulated under Article III.  So for those reasons I'm going to deny the pending motions to dismiss.

Of course, the parties remain free to raise all these issues as the record develops in addition to the merits, and that's what we'll litigate going forward.  But the motions I'm denying today.

The schedule is really not something the parties disagree about very much.  At least once the motions are decided.  So let me do this:  I'll articulate deadlines that I would propose and then see if anybody has comments or objections to that or concerns about it or anything else that

1   we need to address.

2         From a scheduling point of view I'd start with

3   paragraph 5 of your Joint Status Report on joinder, and rather

4   than have a specific date, which is pretty early in any case,

5   I'm simply going to say do that by motion if and when a party

6   thinks there's a need to do that, or a stipulation if everybody

7   agrees, but I won't give you a separate date for that.

8         For discovery overall I'm going to propose June 30 of

9   next year, which is a little longer than you're thinking but I

10   think appropriate.  And I'd key a series of expert disclosures

11   off that.  If you're going to use an expert on an issue where

12   you have the burden of proof, disclose with reports by

13   March 31.  Any other expert you're using disclose by April 30.

14   And if you need a rebuttal expert after that, something

15   surprises you in the April 30 disclosure, disclose with reports

16   by May 15.

17         We'd give you a motion cutoff of July 31, and then I

18   would set a second Rule 16 sometime after the motions are filed

19   so we can get together, find out what's going to be litigated

20   substantively in those motions, whether there's room at that

21   point for ADR, maybe there is, maybe there isn't, and what else

22   needs to be happening from a scheduling point of view.  So

23   those would be the overall deadlines I'd be prepared to set

24   today.

25         For discovery limits my inclination would be to do

just the generic discovery limits at this point under the rules
which would be 10 depositions per side as the current limit
with the seven-hour presumptive limit, 25 interrogatories.  I
think the parties want to limit it to 25 requests for
admission.  That's fine with me too.

So let me start with the plaintiff, Mr. Norris,
concerns, questions, or other things we need to take up from
your perspective?

*MR. NORRIS:*  Thank you, Your Honor.  I think the only
disputed question in the status report was the number of
depositions.

*THE COURT:*  Right.

*MR. NORRIS:*  We initially sued several county
defendants because that's, you know, the data we have, and the
Complaint suggests problems at the county-wide level.  And we
would like to be able to depose all the county defendants.
However, we don't feel strongly about an initial 10
depositions.  Perhaps the county defendants are not fruitful
avenues for discovery, and maybe we'll find that out.  As long
as -- I think my colleagues have already expressed to me that
if we need additional depositions we can raise that by motion
later and they would be accommodating.

*THE COURT:*  Okay.  Let's go to Ms. Briggs for the
defendants.

*MS. BRIGGS:*  Your Honor, Mr. Norris is correct, we do

believe that 10 depositions is plenty. And with respect to the counties, based on your September order he can submit interrogatories and requests for admission to the counties, and I don't -- it seems to me that whatever information he may need to get from them could be gotten from them in that way. So from our perspective 10 depositions is plenty given this case.

THE COURT: Okay. Ms. Brailey.

MS. BRAILEY: We also agree that 10 depositions is plenty, and we also agree that the federal rule set these limits and we think it's fair to abide by them. And, again, we agree that if we need to reassess down the road we would be amenable to conferencing.

THE COURT: Okay. Ms. Prescott, anything you want to add?

MS. PRESCOTT: No, Your Honor.

THE COURT: All right. Mr. Donnini.

MR. DONNINI: Your Honor, we agree as well, but I don't have anything further to add.

THE COURT: Okay. Well, I'm going to go ahead with the deadlines that I outlined, then, and the discovery limits. It doesn't preclude a motion down the road if the plaintiff says "Hey, I need depositions that go beyond that," or it doesn't preclude the parties from agreeing to that if they see it the same way by that time. But I do think that for starting purposes the presumptive limits make sense here. Even from the

allegations that the plaintiff has in the First Amended

Complaint, there's going to be some counties that are more the

focus of interest than others.  And beyond that, as Ms. Briggs

indicates, there are opportunities short of deposition to get

information that may satisfy what the parties need or at least

provide a basis for the Court down the road to say "Well, I

think some additional depositions are needed" or not.

So that's what I'm going to do is stick with the

presumptive limits for now.  But, of course, anybody is free to

either seek protective orders limiting that or adding to that

if the facts develop on the ground differently.

From any party's perspective are there other things

that should be addressed today?  Plaintiff?

*MR. NORRIS:*  No, Your Honor.

*THE COURT:*  Or defense?

*MS. BRIGGS:*  No, Your Honor.

*THE COURT:*  Or intervenors?

*MS. BRAILEY:*  No, Your Honor.

*MR. DONNINI:*  No, Your Honor.

*THE COURT:*  Okay.  Thank you all.  See you next time.

*MS. BRIGGS:*  Thank you.

*THE CLERK:*  Court is adjourned.

*(Proceeding concluded at 4:29 p.m.)*

\*   \*   \*   \*   \*

1          I certify that the foregoing is a correct transcript

2   from the record of proceedings in the above-entitled matter.

3          I further certify that the transcript fees and format

4   comply with those prescribed by the court and the Judicial

5   Conference of the United States.

6

7   Date:   November 3, 2020

8

9                              **/s/ Glenda Trexler**

10                             Glenda Trexler, CSR-1436, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25